RODERICK G. DORMAN (SBN 96908)
dormanr@hbdlawyers.com
LAWRENCE M. HADLEY (SBN 157728)
hadleyl@hbdlawyers.com
HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone:    (213) 694-1200
Facsimile:    (213) 694-1234

Attorneys for Defendants
FINANCE EXPRESS and DAVID L. HUBER

CRAIG N. HENTSCHEL (SBN 66178)
chentschel@dykema.com
DYKEMA GOSSETT LLP
333 South Grand Avenue, Suite 2100
Los Angeles, California 90071
Telephone:    (213) 457-1800
Facsimile:    (213) 457-1850

JESSE J. JENNER (admitted *pro hac vice*)
jesse.jenner@ropesgray.com
LAURENCE S. ROGERS (admitted *pro hac vice*)
Laurence.rogers@ropesgray.com
CHING-LEE FUKUDA (admitted *pro hac vice*)
ching-lee.fukuda@ropesgray.com
ROPES &GRAY LLP
1211 Avenue of the Americas
New York, New York  10036-8704
Telephone:    (212) 596-9000
Facsimile:    (212) 596-9090

Attorneys for Defendant
ROUTEONE LLC

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| DEALERTRACK, INC. | Case No. CV 06-2335 AG (FMOx) |
| Plaintiff, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FINANCE EXPRESS AND ROUTEONE'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY AS TO U.S. PATENT 7,181,427 OR, IN THE ALTERNATIVE, FOR NON-INFRINGEMENT AS TO FINANCE EXPRESS |
| vs. | |
| DAVID L. HUBER, FINANCE EXPRESS LLC, and JOHN DOE DEALERS, | |
| Defendants. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEALERTRACK, INC.,

                Plaintiff

       vs.

ROUTEONE LLC, DAVID L. HUBER, and FINANCE EXPRESS LLC,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

DATE:     June 15, 2009
TIME;     9:00 a.m.
CTRM:    10D

The Honorable Andrew J. Guilford

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................1

II.    STATEMENT OF FACTS ......................................................................4

    A.    THE '427 PATENT .....................................................................4

    B.    THE COURT'S CLAIM CONSTRUCTION ORDER........................6

    C.    FINANCE EXPRESS' ACCUSED FEX SYSTEM .........................7

III.   THE LAW OF SUMMARY JUDGMENT APPLIED TO PATENT INVALIDITY AND NON-INFRINGEMENT ..............................................9

    A.    INVALIDITY ..............................................................................9

    B.    NON-INFRINGEMENT ...............................................................9

IV.    ARGUMENT ........................................................................................10

    A.    THE '427 PATENT FAILS THE *BILSKI* TEST FOR PATENTABLE SUBJECT MATTER................................................10

        1.    Method Claims Must be for Patent Eligible Subject Matter ...................................................................10

            a)    Method Claims Must be Tied to a "Particular Machine or Apparatus".......................11

            b)    Method Claims Must Transform "a Particular Article into a Different State or Thing" ......................14

        2.    The Asserted '427 Claims Do Not Satisfy The "Particular Machine" Test......................................15

        3.    The Asserted '427 Claims Do Not Transform a Particular Article Into a Different State or Thing .................21

    B.    ALTERNATIVELY, THE ACCUSED FINANCE EXPRESS FEX SYSTEM DOES NOT INFRINGE ANY ASSERTED '427 PATENT CLAIM AS A MATTER OF LAW .....................................23

        1.    The Law Of Patent Infringement ...........................................23

        2.    If the '427 Claims Are Tied to a Particular Machine in a Manner that Satisfies *Bilski*, then Finance Express is Entitled to Summary Judgment of Non-Infringement Because its Accused FEX System Uses No Such Machine ...................25

        3.    Finance Express Cannot Induce Infringement .......................27

## TABLE OF CONTENTS (CONT.)

<u>Page</u>

V.    CONCLUSION................................................................................28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

<u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## **Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................9

*Athletic Alternatives, Inc. v. Prince Mfg. Inc.*,
    73 F.3d 1573 (Fed. Cir. 1996)...............................................22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................9

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005)..............................................9

*Cybersource Corp. v. Retail Decisions, Inc.*,
    2009 U.S. Dist. LEXIS 26056 (N.D. Cal. Mar. 26, 2009).......17, 18, 20

*Diamond v. Diehr*,
    450 U.S. 175 (1981).............................................10, 11, 13

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006)............................................25

*Fairbank v. Wunderman Cato Johnson*,
    212 F.3d 528 (9th Cir. 2000)...................................................9

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002)...............................................................18

*Fort Properties v. American Master Lease LLC*,
    2009 U.S. Dist. LEXIS 7217 (C.D. Cal., Jan. 22, 2009)...........2, 3, 9, 14

*Gottschalk v. Benson*,
    409 U.S. 63 (1972).............................................10, 12, 13

*In re Abele*,
    684 F.2d 902 (Fed. Cir. 1982))..............................................21

*In re Bilski*,
    545 F.3d 943 (Fed. Cir. 2008) .........................................passim

*In re Grams*,
    888 F.2d 835 (Fed. Cir. 1989) .........................................14, 17

*K-2 Corp. v. Salomon*,
    191 F.3d 1356 (Fed. Cir. 1999) ............................................22

*Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533 (Fed. Cir. 1991) ............................................22

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ..............................................................22

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-iii-

<u>TABLE OF AUTHORITIES (CONT.)</u>

<u>Page</u>

*Mas-Hamilton Group v. LaGard, Inc.*,
  156 F.3d 1206 (Fed. Cir. 1998) .................................................. 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................... 9

*Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*,
  515 F.3d 1331 (Fed. Cir. 2008) .................................................. 22

*Novartis Corp. v. Ben Venue Labs, Inc.*,
  271 F.3d 1043 (Fed. Cir. 2001) .................................................. 22

*Parker v. Flook*,
  437 U.S. 584, (1978) ........................................................... 11, 13

*Spectra Corp. v. Lutz*,
  839 F.2d 1579 (Fed. Cir. 1988) ................................................... 9

*State St. Bank & Trust Co., v. Signature Fin. Group*,
  149 F.3d 1368 (Fed. Cir. 1998) ................................................... 9

*Stumbo v. Eastman Outdoors, Inc.*,
  508 F.3d 1358 (Fed. Cir. 2007) .................................................. 22

**Statutes**

35 U.S.C. § 101 ............................................................... passim

35 U.S.C. § 271(b) ................................................................ 24

**Other Authorities**

*Ex parte Cornea-Hasegan*,
  No. 2008-4742 at 9-10 (BPAI Jan. 13, 2009) ............................ 12

*Ex parte Gutta*,
  No. 2008-3000 at 5-6 (BPAI Jan. 15, 2009) ......................... 11, 12

*Ex parte Halligan*,
  No. 2008-1588 at 27 (BPAI, Nov. 24, 2008) ............................. 11

*Ex Parte Harris*,
  No. 2007-0325 at 2, 9 (BPAI Jan. 13, 2009) ............................. 12

*Ex Parte Koo*,
  No. 2008-1344 (BPAI Nov. 26, 2008) ...................................... 12

*Ex parte Langemyr*,
  No. 2008-1495 (BPAI May 28, 2008) ...................................... 12

*Ex Parte Nawathe*,
  No. 2007-3360, 2009 WL 327520, *4 (BPAI Feb. 9, 2009) .......... 11

-iv-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# I.    INTRODUCTION

Defendants Finance Express and RouteOne move for summary judgment of invalidity as to claims 1, 3, and 4 of U.S. Patent No. 7,181,427 ("the '427 patent") on the ground that the claims of the '427 patent are not directed to patent-eligible subject matter under 35 U.S.C. § 101.  Alternatively, Finance Express seeks summary judgment of non-infringement because its accused service lacks the subject matter that would be required to satisfy Section 101.

On October 20, 2008, the Federal Circuit issued an *en banc* decision establishing that method claims like those asserted here are invalid for failing to claim a statutory "process" under 35 U.S.C. § 101.  *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008).  The Federal Circuit held that a method claim is drawn to patent-eligible subject matter only if the method steps are "tied to a particular machine" or "transform" a "physical article" into a different state or thing.  *Id.*, 545 F.3d at 961.

Claims 1, 3 and 4 of the '427 patent fall well short of the *Bilski* "machine or transformation" test as a matter of law.  None of the claims is either tied to a "particular machine" or transform a "physical article" into a different state or thing.  Instead, the asserted '427 claims are directed to a business method, tied to human activity, of soliciting credit from lenders and receiving funding decisions.  Claim 1 recites a "computer aided" method of managing a loan application limited to the steps of receiving credit application data, forwarding the data to a plurality of funding sources in one of four alternative ways, and forwarding back to the requestor funding decision data.  Claim 3 adds the steps of aggregating data for dealers having more than one dealership and providing consolidated reports.  Claim 4 adds the step of obtaining credit report data.  Thus, the claims require no more than a series of steps that can be performed by humans with the aid of a general purpose computer.

Although the preamble of claim 1 vaguely recites that the method is "computer aided," the mere "aid" of a computer in performing unspecified steps fails to tie the claimed method to a "particular machine."  In fact, "computer aided" is nothing more

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

LOS ANGELES, CALIFORNIA

-1-

1   than a field-of-use restriction of the type that *Bilski* recognized to be insufficient to

2   render patent-eligible an otherwise unpatentable process claim.  Nor does the recital

3   of "application entry and display devices" or "terminal devices" tie claim 1 to a

4   "particular machine."  Indeed, DealerTrack's own expert concedes that the '427

5   claims do not require a particular computer or programming routine within a

6   computer, but rather are limited only by how fast and in what sequence a human

7   "clicks" buttons on a computer screen to initiate the transfer of credit applications.

8   Under any test, claims directed to how fast a human clicks on a computer screen, or in

9   what sequence, to affect a business transaction, is not patenable.

10        DealerTrack's assertion of infringement by Finance Express confirms that the

11   methods claimed by the '427 patent are not tied to a particular machine.  DealerTrack

12   asserts, and its expert has testified, that Finance Express infringes when a human

13   being clicks a "send credit application" button on a computer screen fast enough to be

14   "substantially at the same time" or stops clicking when the user learns that a "positive

15   funding decision" has been received.  DealerTrack takes this position as to the scope

16   of the '427 claims because it is undisputed that the computer of Finance Express'

17   accused system is not programmed to send a credit application to more than one

18   funding source "substantially at the same time" or "sequentially … until a positive

19   funding decision" as required by the language of claim 1.  Relying on a human being

20   in the performance of these claim steps is the antithesis of being tied to a particular

21   machine.

22        As for the "transformation" part of *Bilski*, DealerTrack apparently concedes

23   that claim 1 does not satisfy that branch of the test.  But even if DealerTrack asserts

24   that it does, this Court's decision in *Fort Properties v. American Master Lease LLC*,

25   2009 U.S. Dist. LEXIS 7217, at 11-12 (C.D. Cal., Jan. 22, 2009) leaves no room for

26   debate.  The transformation test requires that a physical article, or data representing a

27   physical article, be transformed into a different state or thing.  But the credit

28   application and funding decision data of the '427 claims do not represent physical

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-2-

articles.  Rather, like the deedshare data at issue in *Fort Properties*, the application and funding decision data of the '427 claims represent only intangible information in credit funding.  Nor do the '427 claims require any "transformation" of these data.

Because the asserted claims fail both parts of the *Bilski* test, the claims are invalid under 35 U.S.C. § 101.  If, however, the Court believes that the claims are not invalid under Section 101 because they require the use of a particular computer programmed to forward applications "substantially simultaneously" or "sequentially until … a positive funding decision" as claimed (they do not), then Finance Express does not infringe as a matter of law.  It is undisputed that the computers of Finance Express' system are not programmed to send loan applications to potential lenders in these claimed ways.  Instead, as DealerTrack recognizes, automobile dealers **alone** control the timing and sequence of sending loan applications.  DealerTrack has no evidence to the contrary, and its expert witness (who examined Finance Express' source code) agrees.

Thus, there is no tightrope between invalidity and non-infringement on which DealerTrack can walk to maintain this patent infringement action against Defendant Finance Express.  The '427 patent claims are invalid because, as written and construed by DealerTrack in asserting infringement, they are tied to human activity rather than to a particular computer and do not transform anything – let alone an article – to a different state or thing.  But should the Court conclude that the claims are tied to a particular programmed computer, then Finance Express cannot infringe because its accused system lacks a particular computer programmed to forward loan applications in accordance with the recited steps.

## II.    STATEMENT OF FACTS

### A.    The '427 Patent

The '427 patent, which issued February 20, 2007, is entitled "Automated Credit Application System."  According to the Abstract, the invention of the patent is a "computer based credit application processing system [that] provides a graphical user

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-3-

1   interface, automatic software update downloading, lender to lender routing of credit

2   applications, and integration with in-house finance and insurance systems and third

3   party data entry facilities, among other features." The Abstract further explains that

4   the invention accommodates website linkage. As explained in the background section

5   of the '427 patent application, most processes for obtaining credit and financing of

6   major consumer purchases prior to the invention had been done manually, although

7   certain aspects of prior loan application processes had been automated. (Declaration

8   of Lawrence M. Hadley ("Hadley Dec.") Ex. 1, '427 patent at 1:23-35. Ex. 1, '427

9   patent at 1:23-35.) With the invention, the "entire indirect load application

10  processing, routing, and funding" is placed in an on-line environment with graphical

11  user interfaces. (*Id.*, '427 patent at 1:48-2:56.)

12         While the preferred embodiment of the '427 patent describes various physical

13  embodiments of an Internet-based credit application system for use in securing

14  automobile loans, the claims of the '427 patent asserted in this case – claims 1, 3, and

15  4 – recite only a business "process," untied to the Internet or any other particular

16  machine, for sending credit applications to potential lenders and receiving funding

17  decisions. Claims 1, 3, and 4 read in pertinent part as follows:

18         **1. A computer aided** method of managing a credit application, the

19         method comprising the steps of:

20                [A]    receiving credit application data from a remote application

21                       entry and display device;

22                [B]    selectively forwarding the credit application data to remote

23                       funding source terminal devices;

24                [C]    forwarding funding decision data from at least one of the

25                       remote funding source terminal devices to the remote

26                       application entry and display device;

27                [D]    wherein the selectively forwarding the credit application

28                       data step further comprises:

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-4-

[E]   sending at least a portion of a credit application to more than one of said remote funding sources **substantially at the same time**;

[F]   sending at least a portion of a credit application to more than one of said remote funding sources **sequentially until a finding** [sic] **source returns a positive funding decision**;

[G]   sending … a credit application … after a predetermined time …; or;

[H]   sending the credit application from a first remote funding source to a second remote finding source ….

**3.**   The method according to claim 1, further comprising the steps of:

aggregating data for a dealer having a plurality of dealerships located at different locations; and

providing the dealer with a consolidated report using the aggregated data.

**4.**   The method according to claim 1 also including the step of:

obtaining credit report data from at least one remote credit bureau terminal device.

(*Id.*, Ex. 1, '427 patent at 20:54-21:14, 21:18-26 (emphasis and bracketed notations added).)

Claim 1 of the '427 patent issued from application claim 17.  (*Id.* Ex. 2(a), '427 File History (Index of Claims.)  As originally filed, application claim 17 recited a "computer based method of operating a credit application and routing system."  (*Id.* Ex 2(b), '427 Application at 37.)  On May 19, 2000, "to more particularly point out and distinctly claim the subject matter which applicants regard as the invention," claim 17 was amended by the applicants to recite a "computer based method of managing a credit application in a system including a central processor …."  (*Id.* Ex.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   2(c), File History Amendment at 3, 7.)  On December 26, 2002, again "to more

2   particularly point out and distinctly claim the subject matter which Applicants regard

3   as the invention," the applicants changed the preamble yet again to recite a "computer

4   implemented" method of managing a credit application.  (*Id*. Ex. 2(d), File History

5   Amendment at 2, 8.)  Finally, on June 24, 2003, the applicants changed "computer

6   implemented" to the current "computer aided" method of managing credit

7   applications.  (*Id.* Ex.2(e), File History Amendment at 4.)

8        **B.     The Court's Claim Construction Order**

9        This Court's Order Ruling on Claim Construction Arguments (Doc. 550)

10   addressed several terms used by the '427 claims that are relevant to this motion.

11   Those terms, and their constructions, are as follows:

12        *Claim 1*:  First, the Court held that the preamble limits claim 1 "because the

13   term "computer aided" is 'necessary to give life, meaning and vitality' to the claim."

14   (Doc 550 at 27 (*quoting Pitney Bowes v. v. Hewlett-Packard Co.*, 182 F.3d 1298,

15   1305 (Fed. Cir. 1999).)  But the Court declined to construe "computer aided method."

16        Second, the Court construed "remote application entry and display device" in

17   steps [A] and [C] as "**any device**, e.g., personal computer or dumb terminal, remote

18   from the central processor, for application entry and display."  (*Id.*; emphasis added)

19        Third, the Court construed "selectively forwarding the credit application data to

20   remote funding source terminal devices" in step [B] to mean "selectively forwarding

21   the credit application data to particular (i.e., 'selected') remote funding source

22   terminal devices" (*Id*. at 28.)  "Terminal device," in turn, was held to be "**any device**,

23   e.g., personal computer or dumb terminal, located at a logical or physical terminus of

24   the system."  (*Id.* at 20; emphasis added.)

25        Finally, the Court construed "forwarding funding decision data from at least

26   one of the remote funding source terminal devices to the remote application entry and

27   display device" in step [C] to mean "forwarding funding decision data from at least

28   one of the remote funding source terminal devices to the remote application entry and

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

display device from which the credit application was received."  (*Id.* at 28.)

**Claim 4:**  Other than "terminal device," which the Court had already construed (see above), the Court found that no terms required construction.

## C.     Finance Express' Accused FEX System

Finance Express offers an Internet-based system that includes a loan origination platform designed exclusively for independent automobile (*i.e.*, used car) dealers and a comprehensive risk mitigation program for participating lenders ("FEX System"). (Declaration of David L. Huber ("Huber Dec.") ¶ 2; Hadley Dec., Ex. 3 Kaliski Report, at 7.)  The FEX System works in conjunction with any standard computer having an Internet web browser.  To access the FEX System, a dealer logs on by entering an identification and password at the Finance Express website.  Once logged on, the dealer can enter customer information, structure used car sales deals, enter credit applications, obtain credit bureau reports, and submit credit applications to lenders.  A lender can review the credit application, and send back to the FEX System the decision on whether to provide credit to the applicant.  Once the funding decision arrives back at the FEX System, the dealer can view the funding decision at the same website.  (Huber Dec., ¶ 3; Hadley Dec., Ex. 3, Kaliski Report at 8-9.)

At the central facility, the FEX System includes a web server (a computer) for receiving and sending data between remote dealers, lenders, and credit bureaus, and a database server (another computer) for accessing information in a database.  The web server provides access to the Internet and stores the web pages accessed by dealers and lenders.  The database stores information received from dealers, lenders, and credit bureaus, and the database server allows the web server to access information in the database.  (Huber Dec., ¶ 4; Hadley Dec., Ex. 3, Kaliski Report at 8.)

It is undisputed that the FEX System's servers contain no programming to direct the timing or sequence of sending credit applications to potential lenders or returning funding decisions.  Instead, dealers alone control the timing and sequence of sending loan applications, and decide when to stop the sending, solely through

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

interaction with a mouse and web browser.  After a dealer enters a credit application into a form provided on the dealer's web browser, the FEX System checks the application for errors and presents the dealer with a screen listing lenders available to the dealer.  (Huber Dec., ¶ 6; Hadley Dec., Ex. 3, Kaliski Report at 9-10.)  If the credit application data satisfies a particular lender's requirements, a green "Send to Lender" button appears to the right of the lender's name.  (Huber Dec. ¶ 6; Hadley Dec., Ex. 3, Kaliski Report at 10-11.)  Using a mouse, the dealer can "click" on any green "Send to Lender" button, which causes the FEX System to send the application to the Internet address corresponding to the selected lender.  When the dealer clicks on a green "Send to Lender" button, all other green "Send to Lender" buttons turn grey, preventing the dealer from clicking on another "Send" button until the FEX System has transmitted the application onto the Internet.  (Huber Dec. ¶ 6; Hadley Dec., Ex. 3, Kaliski Report at 10-11.)

Once the FEX System has transmitted the application to the selected lender, those "Send to Lender" buttons on the dealer's browser next to lenders for which the applicant qualifies return to "green," allowing the dealer – if desired – to click on another green button to initiate a transfer of the application to another lender.  This process can continue as long as green buttons appear on the dealer's browser to click, even if (in the interim) a lender has returned a positive funding decision.  (Huber Dec., ¶ 7, Hadley Dec. Ex. 3, Kaliski Report, Ex. 13 at 4, 10.)[1]

---

[1] Prior to November 2006, the dealer's web browser also showed a green "Send to All Qualified Lenders" button.  When clicked, this button invoked a software routine programmed into the FEX System source code that directed the system to automatically send the application to as many as five lenders substantially simultaneously – called "shot-gunning" in the industry.  On or about November 21, 2006 (before the '427 patent issued), Finance Express removed the "shot-gunning" code and the "Send to All Qualified Lenders" feature from its system.  (Huber Dec. ¶ 8, Hadley Dec., Ex. 3, Kaliski Report, Ex. 13 at 4.)  Thus, at all times since issuance of the '427 patent, the dealer alone, and not any computer program, controls the timing and sequence of sending, and when to stop sending, applications to lenders over the FEX System.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

III.  **THE LAW OF SUMMARY JUDGMENT APPLIED TO PATENT INVALIDITY AND NON-INFRINGEMENT**

   A.  **Invalidity**

   This Court's recent *Fort Properties* decision, which granted summary judgment of invalidity under the test set forth in *Bilski*, properly states the standard for summary judgment as applied to patent invalidity and is not repeated here.  *Fort Properties*, 2009 U.S. Dist. LEXIS 7217, at *4-6.

   B.  **Non-Infringement**

   DealerTrack must establish infringement by a preponderance of the evidence. *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).  As proof of infringement is DealerTrack's burden, Finance Express need only point out on this motion "that there is an absence of evidence to support the nonmoving party's case."  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once Finance Express meets its initial burden, DealerTrack then "must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted); Fed. R. Civ. P. 56(e).  Otherwise, summary judgment is appropriately granted.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Spectra Corp. v. Lutz*, 839 F.2d 1579, 1581 (Fed. Cir. 1988).

IV.  **ARGUMENT**

   A.  **The '427 Patent Fails the *Bilski* Test for Patentable Subject Matter**

   *Bilski* rejected prior standards – such as the "useful, concrete, and tangible result" test[2] – for determining whether a claimed business method was directed to patent-eligible subject matter under 35 U.S.C. § 101.  Under the *Bilski* standard, a

_____

[2] *State St. Bank & Trust Co., v. Signature Fin. Group*, 149 F.3d 1368, 1373 (Fed. Cir. 1998).  This test governed the patentability determination during examination of the '427 patent application, which issued on February 20, 2007.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

process claim must be "tied to a particular machine, or … transform[] an article." *Bilski*, 545 F.3d at 961. Here, the asserted claims of the '427 patent meet neither prong of the *Bilski* test. Thus, as a matter of law, the claims are invalid.

### 1.   Method Claims Must be for Patent Eligible Subject Matter

To be patentable, a patent claim must meet the subject matter eligibility requirements of 35 U.S.C. § 101. Under Section 101, a patent clam may be drawn to a process but only if it does not claim "laws of nature, natural phenomena, [or] abstract ideas." *Diamond v. Diehr*, 450 U.S. 175, 185 (1981). Fundamental principles, mental processes, and intellectual concepts are the basic tools of science, technology and commerce, and therefore cannot be patented. *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972). An idea is not patentable, nor is something that would have the same "practical effect" as patenting an idea. *Id.* at 72. "Transformation and reduction of an article 'to a different state or thing' is the clue to the patentability of a process claim that does not include particular machines." *Diehr*, 450 U.S. at 184 (*quoting Gottschalk*, 409 U.S. at 70). Thus, "[p]urported transformations or manipulations simply of public or private legal obligations or relationships, business risks, or other such abstractions" without any connection to a particular device or article or without "the transformation of any physical object or substance" into another state or thing, is not eligible for patenting. *Bilski*, 545 F.3d at 963.

Whether a claim is drawn to patent-eligible subject matter is an issue of law and the "threshold inquiry of patent validity." *Bilski*, 545 F.3d at 950-51 (citations omitted). Accordingly, any patent claim "failing the requirements of §101 must be rejected even if it meets all of the other legal requirements of patentability." *Id.* When analyzing a claim under Section 101, it must be considered "as a whole," *Diehr*, 450 U.S. at 188.

### a)   Method Claims Must be Tied to a "Particular Machine or Apparatus"

The first prong of the *Bilski* inquiry asks whether the claim "is tied to a

-10-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

particular machine or apparatus …."  545 F.3d at 954.  While the Federal Circuit left to future cases the task of "elaborating the precise contours" of the machine prong, *id.* at 962, the Court provided several requirements that a claimed method must exhibit to satisfy the particular machine test.  First, the claim must be limited to a **particular** or specific machine or structure.  *Id.* at 961-62.  Second, the machine or structure must be sufficiently "tied" to the claimed process.  *Id.*  Third, the use of the machine must impose meaningful limits on the scope of the claims.  *Id.*  Finally, the "involvement of the machine" in the claimed process "must not merely be insignificant extra-solution activity" – meaning that obvious additions of machine or structure to a claim will not save an otherwise non-patentable claim.  *Id.* at 957 ("'The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance.'") (*quoting Parker v. Flook*, 437 U.S. 584, 590 (1978)).

Since *Bilski*, the Board of Patent Appeals and Interferences ("BPAI") has rendered a number of decisions analyzing whether patent claims, particularly those claiming methods with the assistance of computers and communications networks, are sufficiently tied to particular machines to satisfy Section 101.

First, claims reciting the use of general purpose processors or computers to perform method steps do not satisfy the *Bilski* particular machine test.  *Ex parte Halligan*, No. 2008-1588 at 27 (BPAI, Nov. 24, 2008) (*quoting Diehr*, 450 U.S. at 191-92); *Ex parte Gutta*, No. 2008-3000 at 5-6 (BPAI Jan. 15, 2009) (rejecting under Section 101 a claim reciting "a computerized method performed by a data processor"); *Ex Parte Nawathe*, No. 2007-3360, 2009 WL 327520, *4 (BPAI Feb. 9, 2009) (rejecting under Section 101 a claim reciting a "computerized method" of inputting and representing XML documents as insufficiently tied to "a particular computer specifically programmed for executing the steps of the claimed method.").  Thus, simply reciting the use of a processor to implement functional steps, through programming in an unspecified manner, using an unspecified algorithm, does not tie a

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   process step to a particular machine as required by Section 101.  *Ex parte Cornea-*

2   *Hasegan*, No. 2008-4742 at 9-10 (BPAI Jan. 13, 2009).[3]

3         Second, claims merely reciting a step of "displaying" failed the "particular

4   machine" test because "displaying" need not be performed by any **particular**

5   structure.  *Ex parte Gutta*, No. 2008-3000 at 5-6 (BPAI Jan. 15, 2009); *Ex parte*

6   *Langemyr*, No. 2008-1495 (BPAI May 28, 2008) (finding a step of "displaying" to be

7   only a nominal or token recitation of structure "incidental to transformation.").

8         Third, claims reciting steps taking place in a "database system" fail the machine

9   prong because database systems may refer only to software without the requirement

10   of any particular machine.  *Ex Parte Koo*, No. 2008-1344 (BPAI Nov. 26, 2008).

11        Fourth, claims directed to steps taking place over "a network" are not

12   sufficiently tied to a particular machine because a "network" could broadly include a

13   societal network.  Moreover, claims limited to steps taking place on electronic

14   networks fail the "machine" prong because a "network" is not a recitation of a

15   particular machine, but rather a field of use limitation.  *Ex Parte Harris*, No. 2007-

16   0325 at 2, 9 (BPAI Jan. 13, 2009).

17              **b)      Method Claims Must Transform "a Particular Article**

18                      **into a Different State or Thing"**

19        The second branch of the *Bilski* inquiry asks whether the claim "transforms a

20   particular article into a different state or thing."  *Bilski*, 545 F.3d at 954, 961-62

21   (*citing Benson*, 409 U.S. at 70).  To be patentable under this test, a process claim must

22   transform ***physical objects or substances, or something representing physical objects***

23   ***or substances***.  *See Bilski*, 545 F.3d at 963.  "Even a claim that recites 'physical steps'

24   but neither recites a particular machine or apparatus, nor transforms any article into a

25   different state or thing, is not drawn to patent-eligible subject matter."  *Id.*, 545 F.3d at

26

27   _____

28   [3] For the Court's convenience, copies of the BPAI cases cited herein are attached to
     the accompanying Hadley Declaration.  (*See* Hadley Dec., Exs. 5-11.)

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

961.  Incidental or token recitations of transformations are not sufficient.  The Federal Circuit explained that, just as with the particular machine test, "transformation of an article must impose meaningful limits on the claim's scope."  Thus, "the claimed process must not merely be insignificant post-solution activity."  *Id.* at 961-62 (*citing Benson*, 409 U.S. at 71-72, and *Parker v. Flook*, 437 U.S. 584, 590 (1978).  In addition, "mere field-of-use limitations are generally insufficient to render an otherwise ineligible process claim patent-eligible.  *Id.* at 957 (*citing Diamond v. Diehr*, 450 U.S. 175, 191-92 (1981)).

Just as important as knowing what the proper test is for determining whether a method claim is patent-eligible, is knowing what tests are improper.  First, a claimed method is not patent-eligible just because it is performed by software that produces a tangible result.  *Bilski*, 545 F. 3d at 961 (rejecting the "useful, concrete and tangible result" test as " inadequate").  Second, even a claim that recites such physical steps as inputting, calculating, outputting or storing numbers or data "in and of itself would not render [the claim] statutory subject matter."  *Id.* at 961.  It is thus "simply inapposite to the § 101 analysis whether process steps performed by software on a computer are sufficiently 'physical'."  *Id.* at 961 n.26.  Third, manipulating data by a programmed computer does not necessarily qualify that data as an "article" that is "transformed" as *Bilski* requires.  Rather, the data must represent something physical and be transformed in a meaningful way.  *Id.* at 962-63 (observing that data representing a physical or tangible object – such as x-ray data representing "the structure of bones, organs, and other body tissues" – that is changed into a particular visual depiction of the physical object on a display has been held sufficient to render a claimed method patent-eligible under Section 101).  Fourth, a claim that merely adds a data-gathering step to an otherwise unpatentable algorithm is "insufficient to convert that algorithm into a patent-eligible process."  *Id.* at 963 (*citing In re Grams*, 888 F.2d 835, 840 (Fed. Cir. 1989)).  Finally, as this Court itself noted in *Fort Properties*, the transformation in a business method of legal obligations or

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-13-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   relationships, business risks, or other abstraction which are not physical objects nor

2   representative of physical objects does not constitute the transformation of an article.

3   *Fort Properties*, 2009 U.S. Dist. LEXIS 7217, *10-*11.

4           **2.**    **The Asserted '427 Claims Do Not Satisfy The "Particular**

5               **Machine" Test**

6         None of the asserted claims 1, 3, or 4 satisfy the "particular machine" prong of

7   *Bilski*.  The asserted claims, which purport to pre-empt the entire business field of

8   sending and receiving credit applications at particular time intervals and in particular

9   sequences, depend solely on human activity.

10         While the preamble of claim 1 describes the method as "computer-aided,"

11   neither claim 1 nor dependent claims 3 and 4 identify a computer or any other

12   machine (let alone a "particular machine") as directing or even participating in the

13   recited steps.  In fact, a computer can "aid" in the recited method only by acting as a

14   "remote application entry and display device" and "terminal devices" so credit

15   applications can be entered and received, and funding decisions can be displayed.  But

16   even if a computer "aids" in these steps ([A], [B], and [C]), the recited steps do not

17   specify any "particular machine" for these devices.  Reciting merely a requirement for

18   "terminals" and "display devices" fall well short of tying the claimed method to

19   "particular machines."

20         Moreover, limitations [D] through [H], which describe the alternative steps for

21   "selectively forwarding" credit applications to remote funding sources, on their face

22   require no machine whatsoever.  Instead, the timing and sequencing alternatives

23   recited in these limitations for "selectively forwarding" broadly cover the actions of a

24   dealer – namely, how fast, and in what sequence, the dealer "clicks" buttons on his or

25   her computer screen.  Under any test, business methods that depend entirely on

26   human activity, such as how fast and in what sequence a person clicks on a computer

27   screen, cannot be patented.

28         DealerTrack's expert, Dr. Kaliski, concurs that the asserted claims require no

"particular machine."  Dr. Kaliski further agrees that the claims are directed to how a dealer presses buttons on a computer screen, not how a computer is programmed with particular algorithms to "selectively forward" credit applications to potential funding sources.  In his recent deposition, Dr. Kaliski first admitted that "computer aided" in the preamble of claim 1 imposes no structural requirement beyond the use of a general purpose computer:

> Q    In the preamble of Claim 1, it states, "A computer-aided method of managing a credit application, the method of comprising the steps of," and then it goes on.  What is your understanding of "computer-aided"?
>
> A    That a computer assists in the implementation of the functionality of this system.  But ***usually when you say "computer-aided," it's expected that a human would be in the loop as well.***
>
> *   *   *
>
> Q    … To perform the recited method, ***does Claim 1 require the use of any particular machine***?
>
> *   *   *
>
> A    ***The claim is silent on that***.
>
> Q    Can a general purpose computer be used to perform the steps that are recited in Claim 1?
>
> A    I believe so.

(Hadley Dec., Ex. 4 at 53:23-55:16 (emphasis added).)  Dr. Kaliski also admitted that "computer aided" does not require any particular programming or algorithm to implement the recited steps:

> Q    Does the claim, in your view, specify any particular program or programming?
>
> THE WITNESS:  No.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-15-

(*Id.*, Ex. 4 at 56:10-15 (emphasis added; objections omitted).)  Dr. Kaliski further agreed that the term "selectively forwarding" in claim 1 imposes no requirement beyond "forwarding to particular or selected destinations," including no requirement for a central processor and no requirement for the execution of software on a central processor to forward credit applications in the recited ways:

> Q    Does Claim 1 require software code executing on a central
>       processor to selectively forward credit application data to remote
>       funding sources in one of the four recited ways?
>
> A    It is -- ***the claim doesn't require a central processor to carry
>       out the method, and so it certainly cannot require that the
>       software got executed on the central processor.***
>
> Q    So the answer to my question is, no, in your view?
>       THE WITNESS:  It's no.

(*Id.*, Ex. 4 at 63:20-64:16 (objections omitted; emphasis added); *see also* 62:2-24.)

Finally, Dr. Kaliski confirmed that satisfying the limitation of "selectively forwarding … a credit application" either "substantially at the same time" or "sequentially until a finding [*sic*] source returns a positive funding decision" turns entirely on human action – namely, how fast, and in what sequence, a dealer "clicks" on the "send" button appearing on the dealer's web browser – not on the operation of any particular machine:

> Q    Is there any way that this limitation of sending sequentially until a
>       positive decision is made can be met through action other than by
>       the action of a dealer?
>
> A    I'm not sure.
>
> Q    Do you have ***any opinion*** as to whether this application -- ***this
>       limitation could be met by any way other than what a dealer
>       does***?
>
> A    ***No.***

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Q      And, similarly, just to go back, the limitation of sending sequentially, at substantially the same time, ***do you agree that whether that limitation is met is determined solely by how fast a dealer presses the buttons***?

A      ***Yes***.

(*Id.*, Ex. 4 at 94:15 – 95:4 (emphasis added).)

While *Bilski* declined to address the "precise contours" of when a computer suffices to tie a process claim to a particular machine, courts prior to and since *Bilski* have rejected under Section 101 claims like those at issue here. For example, in a case cited and relied on by *Bilski*, the Federal Circuit rejected under Section 101 claims reciting a method of testing a complex system to determine whether a system condition is normal or abnormal and, if abnormal, the cause of the abnormality. *In re Grams*, 888 F.2d 835 (Fed. Cir. 1989). The independent claim at issue in *Grams* essentially described an algorithm, with the only physical step limited to providing data for the algorithm. *Id*. at 840. While one of the dependent claims required that the method be performed with a "programmed computer," the Federal Circuit found that additional language insufficient to bring the claim within the scope of Section 101. *Id*. at 841. In the same way, "computer aided" is, at best, a field of use restriction insufficient to bring the '427 claims within the scope of Section 101.

More recently, Judge Patel in the Northern District of California found that a method claim for detecting fraud in a credit card transaction between a consumer and a merchant over the Internet failed the machine prong of *Bilski*. *Cybersource Corp. v. Retail Decisions, Inc.*, 2009 U.S. Dist. LEXIS 26056 (N.D. Cal. Mar. 26, 2009). Judge Patel considered whether recitation of the phrase "over the Internet" sufficed to tie the claimed process to a particular machine. For three reasons, it did not. First, "over the Internet" lacked a nexus to a "particular" machine because the Internet is a made up of multiple machines. Second, "over the Internet" constituted insignificant extra-solution activity to the underlying unpatentable business method of fraud

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-17-

detection.  Finally, use of the Internet did not impose any meaningful limits on the scope of the claims.  *Id.* at \*20-23.  Just as the claim for detecting fraud over the Internet, which necessarily would require one or more computers, a claim for sending and receiving credit applications, even if "computer aided," is neither tied to a "particular" machine, nor contains any meaningful limit on scope.

Moreover, amendments to the preamble language during prosecution demonstrate that applicants, in reciting "computer aided," contemplated no particular machine.  The original application recited a "computer based" method.  (Hadley Dec., Ex. 2(b) at 37.)  Later amendments added the use of a "central processor" to the "computer based" method (*id.*, Ex. 2(c) at 3), then changed to a "computer implemented method."  (*Id.*, Ex. 2(d) at 2.)  In settling on a "computer aided" method, the applicants overtly backed-off from any notion that the recited method steps must be "based" on the operation of a computer, "implemented"  by a computer, or use a "central processor."  Thus, the amendments confirm the applicants' intent that the method steps cover human activity – such as a dealer clicking buttons – not operation of a programmed computer.  DealerTrack is estopped from asserting any different scope.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).

Finally, numerous BPAI decisions make clear that the claims of the '427 patent, if subjected to examination by the Patent Office in view of Bilski, would not survive scrutiny.  In each decision, claims much like those at issue here were rejected because they were tied to no more than a general purpose computer without any particular algorithm, or tied only to some display device.  (Hadley Dec., Exs. 5-11.)  While claims reciting the steps that a machine performs to accomplish an end result may satisfy the *Bilski* "particular machine" prong, claims reciting steps that a human must perform – even if the steps are performed on a computer screen or initiate some business activity over the Internet – lack the requisite tie to a "particular machine.  Thus, given DealerTrack's contention that claims claim 1, 3 and 4 depend on steps performed by humans, and not by a programmed computer, none of these claims can

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-18-

satisfy the "particular machine" prong of *Bilski*.

### 3. The Asserted '427 Claims Do Not Transform a Particular Article Into a Different State or Thing

Asserted claims 1, 3 and 4 each fail the "transformation" prong of the Bilski test because none transforms a physical article, or data representing a physical article, into a different state or thing.  The claimed data are not "articles," and there is no transformation of anything at all anywhere in these claims.

*Independent Claim 1.*  There should be no legitimate dispute that the "credit application data" and "funding decision data" of the claim are not "articles" within the meaning of the *Bilski* test.  The data are not tangible or physical things and do not represent anything tangible or physical.  They represent, instead, intangible data or information – a request for, and decision to grant, a loan.

Even  if the data were "articles" (they are not), however, nothing in claim 1 transforms the data into "a different state or thing."  No transformation is involved in simply "receiving" credit application data in some unspecified way at an "application entry and display device" and "forwarding" that data to "funding source terminal devices."  The claim does not say how the credit application data are created or received, or forwarded to the funding sources, or even what happens to the data once they get to the funding source.  "Receiving" and "forwarding" data are no more transformations than were the steps in *Bilski* of "initiating" and "identifying."  *See Bilski*, 545 F.3d at 949, 963, 965-66 ("while the claimed process contains physical steps (initiating, identifying), it does not involve transforming an article into a different state or thing").

As for the "funding decision data" that are forwarded back to the remote application input and display device, the claim does not say how the funding decision data are created.  Nothing in the claim requires transforming the credit application data in some manner so as to obtain the funding decision data.  Indeed, the claim does not even require that the credit application data or funding decision data be displayed.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-19-

Judge Patel's *Cybersource* decision also supports the conclusion that the method of claim 1 fails the transformation test.  *Cybersource* held that claims failed the "transformation" test even though they recited the "Internet" and a "processor" executing "program instructions," because "[o]n their face, the claimed methods simply obtain and compare intangible data pertinent to business risks."  2009 U.S. LEXIS 26056 at *8.  In reaching this conclusion, Judge Patel importantly recognized that more than mere manipulation of data was required to be a "transformation":

> At the outset, it must be noted that the respective ordinary meanings of the terms "transformation" and "manipulation" differ. "Transformation" suggests a fundamental change, whereas "manipulation" does not. … There is no indication that the Federal Circuit, having reaffirmed the machine-or-transformation test, intended to weaken the key term "transformation" by equating it with mere "manipulation." The processes claimed in the '154 patent unquestionably "manipulate" credit card numbers by using them to build a "map."  But it is equally clear that neither credit card numbers nor credit cards are "transformed."

*Id.*, 2009 U.S. LEXIS 26056 at *10.

**Dependent Claim 3.**  Claim 3 adds to claim 1 the steps of "aggregating data" for a dealership having a plurality of dealer locations, and "providing" to the dealer a "consolidated report using the aggregated data."  These steps do not transform an article for at least two reasons.  First, the claim doesn't even say what the "data" is that's being aggregated.  Such open-ended non-specificity precludes the data from being or representing an "article."  *Bilski*, 545 F. 3d at 962 (confirming as non-patentable a claim reciting a process of graphically displaying variances of data from average values because the "claim did not specify any particular type or nature of data; nor did it specify how or from where the data was obtained or what the data

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

represented") (*citing In re Abele*, 684 F.2d 902, 909 (Fed. Cir. 1982)).  Second, claim 3 adds only a data-gathering step to the patent-ineligible method of claim 1.  *Bilski*, again, is directly on point:  "This court and our predecessor court have frequently stated that ***adding a data-gathering step to an algorithm is insufficient*** to convert that algorithm into a patent-eligible process."  *Bilski*, 545 F. 3d at 963 (emphasis added).

     ***Dependent Claim 4.***  Claim 4 runs afoul of Section 101 for the same reasons as claim 3.  Claim 4 adds to claim 1 the data-gathering step of "obtaining credit report data."  The credit report data is not an "article" because it does not represent anything physical.  Credit report data is data from a credit bureau about a person's credit.  Moreover, as a data-gathering step, it necessarily follows – and it is apparent from the claim – that the credit report data are not being transformed by the claim.

**B.**    **Alternatively, the Accused Finance Express FEX System Does Not Infringe Any Asserted '427 Patent Claim as a Matter of Law**

     If the Court disagrees with DealerTrack's expert, Dr. Kaliski, and instead holds that the "computer aided" method of the '427 claims does require a "particular machine" to perform the claimed steps (*e.g.*, a central processor programmed to selectively forward credit applications in the recited ways), then Finance Express is entitled to summary judgment of non-infringement.  This is because the FEX System indisputably lacks a central processor programmed to selectively forward credit applications at either "substantially the same time" or "sequentially until a funding source returns a positive funding decision."  Thus, Finance Express cannot directly infringe.  Without a direct infringement, Finance Express cannot induce infringement.

**1.**    **The Law Of Patent Infringement**

     "An infringement analysis is a two step process" consisting of claim construction and application of the properly construed claims to the accused device.  *K-2 Corp. v. Salomon*, 191 F.3d 1356, 1362 (Fed. Cir. 1999).  The proper construction of the patent claims is a matter of law.  *Markman v. Westview Instruments, Inc.*, 517

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

U.S. 370, 372 (1996).

"To establish infringement, every limitation set forth in patent claim must be found in accused product or process exactly or by substantial equivalent." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).  If even a single claim element is missing from an accused product, that claim cannot be infringed.  *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998); *Laitram Corp.*, 939 F.2d at 1535.

Although the step of comparing the construed claims with the accused product generally is a question of fact, it need not involve a disputed issue of material fact.  The Federal Circuit frequently has affirmed summary judgment of non-infringement where there was no genuine issue of material fact.  *See, e.g., Novartis Corp. v. Ben Venue Labs, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001); *Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*, 515 F.3d 1331 (Fed. Cir. 2008); *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358 (Fed. Cir. 2007).  In particular, where – as here—the operation of the accused system is not in dispute and there is no evidence of infringement under the Court's claim constructions, "'the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment.'"  *K-2 Corp.*, 191 F.3d at 1362 (*quoting Athletic Alternatives, Inc. v. Prince Mfg. Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996)).

> **2.  If the '427 Claims Are Tied to a Particular Machine in a Manner that Satisfies *Bilski*, then Finance Express is Entitled to Summary Judgment of Non-Infringement Because its Accused FEX System Uses No Such Machine**

Should the Court disagree with Dr. Kaliski, and find that the asserted claims of the '427 patent are tied to a particular machine, the undisputed facts establish that Finance Express cannot infringe.  To satisfy the particular machine prong of *Bilski*, the "computer aided" language of the preamble and the "selective forwarding" language in the recited steps would need to require (at least) the use of a central

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-22-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

processor programmed to execute software code that selectively forwards credit applications to remote funding sources (1) at "substantially the same time" and (2) "sequentially until a funding source returns a positive funding decision." ('427 patent at 20:63-21:4.) Yet Dr. Kaliski, who examined Finance Express' source code, admits that the FEX System contains no such particularly programmed central processor:

> Q    Is there any code in the Finance Express System that directs applications to be sent sequentially and then to stop sending applications as soon as a funding decision is -- a positive funding decision is made by one of the lenders?
>
> A    I'm not aware of such code.
>
> Q    …. Do you agree, then, that whether this limitation is met, namely sending applications sequentially until a positive funding decision is made, is a function solely of action by a dealer?
>
> THE WITNESS:  Well, a dealer can certainly make that happen.
>
> . . . .
>
> Q    And, similarly, just to go back, the limitation of sending sequentially, at substantially the same time, do you agree that whether that limitation is met is determined solely by how fast a dealer presses the buttons?
>
> A    Yes.

(Hadley Dec., Ex. 4 at 93:21-94:13, 94:24-95:4.)  Thus, Finance Express is entitled to summary judgment of non-infringement under any reading of the asserted claims that satisfies the *Bilski* machine test.

The reason the accused FEX System cannot infringe under any construction tying the asserted '427 claims to a particular machine is even more apparent in light of a change Finance Express made to its code before the '427 patent issued. Prior to November 2006, the dealer's web browser showed a green "Send to All Qualified Lenders" button. Clicking on the "Send to All Qualified Lenders" button initiated a

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   routine programmed into the FEX System source code, which directed the system to
2   "shotgun" the application to up to five lenders in an uninterrupted sequence.  (Huber
3   Dec. ¶ 8.)  More specifically, as Dr. Kaliski explained, the shot-gunning code
4   triggered by the "Send to All Qualified Lenders" button activated code containing a
5   list of preferred lenders together with a routine that cycled through each lender,
6   automatically directing the transfer.  (Hadley Dec. Ex.4 at 68:13-25, 69:23-70:4.)  On
7   or about November 21, 2006 (before the '427 patent issued), Finance Express
8   removed the "shot-gunning" program code from its central computer, and removed
9   the "Send to All Qualified Lenders" from the web page that appears on a dealer's web
10  browser.  (Huber Dec., ¶ 4, Hadley Dec., Ex. 2, Kaliski Report, Ex. 13 at 4, 10.)

11          With the removal of the shot-gunning code, DealerTrack was forced to reveal
12  the full breadth – and the invalidity – of its '427 claims by asserting that infringement
13  nevertheless occurs when a human being alone clicks more than one "Send to Lender"
14  button on a computer screen during a relatively short time interval (which
15  DealerTrack says meets the "substantially at the same time" step) or stops clicking
16  when the user learns that a positive funding decision has been received (which
17  allegedly meets the "sequentially until" step).  By adopting such a broad construction
18  – requiring only human action and no programming of a central processor to affect the
19  claimed forwarding of credit applications – the claims cannot be tied to a "particular
20  machine."  Either way, Finance Express is entitled to summary judgment:  the claims
21  are invalid under *Bilski* or Finance Express cannot infringe.

22          **3.      Finance Express Cannot Induce Infringement**

23          Liability for inducing patent infringement first requires proof that another
24  person directly infringed the patent.  35 U.S.C. § 271(b).  Additionally, mere
25  knowledge of acts alleged to constitute direct infringement is insufficient to find
26  liability for active inducement.  Rather, DealerTrack must prove that once Finance
27  Express knew of the '427 patent, it actively and knowingly aided and abetted another
28  person to infringe.  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304-06 (Fed. Cir.

-24-

2006).  Here, DealerTrack has not made any showing or cited any facts establishing that some third party directly infringes the '427 patent.  Nor can DealerTrack offer any evidence that Finance Express specifically intended to cause anyone to infringe the asserted claims of the '427 patent.  Thus, Finance Express could not have actively induced infringement of the '427 patent, and is entitled to summary judgment on DealerTrack's inducement claim.

## V.     CONCLUSION

For the foregoing reasons, this Court should grant Finance Express' and RouteOne's motion for summary judgment that claims 1, 3, and 4 of the '427 patent are invalid under 35 U.S.C. § 101.  Alternatively, this Court should grant Finance Express summary judgment of non-infringement.

DATED:     May 18, 2009                HENNIGAN, BENNETT & DORMAN LLP


By_____/s/ Lawrence M. Hadley_____
          Lawrence M. Hadley

Attorneys for Defendants
FINANCE EXPRESS and DAVID L. HUBER

DYKEMA GOSSETT LLP

ROPES & GRAY LLP


By_____/s/ Laurence S. Rogers_____
          Laurence S. Rogers

Attorneys for Defendants
ROUTEONE LLC